**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

COASTAL CONSERVATION
ASSOCIATION,                                    }
                              *Plaintiff*        }
v.                                               }
                                                 }
CARLOS GUTIERREZ, in his official                }
capacity as Secretary of the United States       }
Department of Commerce; THE NATIONAL             }
OCEANIC AND ATMOSPHERIC                          }
ADMINISTRATION; and THE NATIONAL                 }
MARINE FISHERIES SERVICE,                        }
                                                 }      CIVIL ACTION NO. H-05-1214
                              *Defendants*        }      Consolidated With
                                                 }      CIVIL ACTION NO. H-05-2998
and                                              }
                                                 }
GULF RESTORATION NETWORK and                     }
THE OCEAN CONSERVANCY,                           }
                                                 }
                              *Plaintiffs*,       }
v.                                               }
                                                 }
CARLOS GUTIERREZ, et al.,                        }
                                                 }
                              *Defendants*.       }


**MEMORANDUM OPINION AND ORDER**

        Plaintiffs, the Coastal Conservation Association ("CCA"), the Gulf Restoration

Network ("GRN"), and the Ocean Conservancy ("TOC"), are challenging the Secretary of

Commerce's adoption of Amendment 22[1] to the Gulf of Mexico Reef Fishery Management Plan

("FMP" or "management plan").  Plaintiffs bring their claims under the Administrative

Procedures Act ("APA"), 5 U.S.C. § 701 *et seq.*, the National Environmental Policy Act

("NEPA"), 42 U.S.C. § 4341 *et seq.*, and the Magnuson-Stevens Fishery Conservation and

---

[1]Amendment 22 can be found in the administrative record (AR) at Vol. 9, 4263-4610.

Management Act ("Fishery Act"), 16 U.S.C. § 1801 *et seq.*  Pending before the court are cross motions for summary judgment.  For the following reasons, the court ORDERS that Defendants' motion for Summary Judgement is GRANTED-in-part and DENIED-in-part and Plaintiffs' motions for summary judgment are GRANTED-in-part and DENIED-in-part.

I.  Facts

A. *The Regulation and Management of Marine Fisheries Under Federal Law.*

Congress passed the Fishery Act to "conserve and manage the fishery resources found off the coasts of the United States." *See* Pub. L. No. 94-265, § 1,  90 Stat. 331 (1976). The Fishery Act was prompted by Congress's concern that the Nation's fisheries, described as "valuable and renewable resources," were being over exploited.  16 U.S.C. § 1801(a)(1). "Certain stocks of fish have declined to the point where their survival is threatened, and other stocks of fish have been so substantially reduced in number that they could become similarly threatened . . ." 16 U.S.C. § 1801(a)(2). Congress proposed, as a result,  to "provide for the preparation and implementation, in accordance with national standards, of fishery management plans which will achieve and maintain, on a continuing basis, the optimum yield from each fishery."  16 U.S.C. 1801(b)(4).

Eight Regional Fishery Management Councils were formed to "exercise sound judgment in the stewardship of fishery resources." 16 U.S.C. 1801(b)(5).  The Councils produce and monitor the fishery plans required by the Fishery Act.  The Department of Commerce, functionally the National Marine Fisheries Service ("Service"), reviews the plans before promulgating them through notice and comment rule making. 16 U.S.C. 1854(a). The Gulf Region is managed by the Gulf of Mexico Fishery Management Council ("Council" or "Gulf Council").

Fishery Management plans are guided by ten national standards.  16 U.S.C. § 1851(a) (1)-(10). National standards one, two, eight and nine are particularly relevant to this case.  They provide as follows:

> National standard one: "Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry."  16 U.S.C. § 1851(a)(1);
>
> National standard two: "Conservation and management measures shall be based upon the best scientific information available." 16 U.S.C. § 1851(a)(2);
>
> National standard eight: "Conservation and management measures shall, consistent with the conservation requirements of this Act (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities by utilizing economic and social data that meet the requirements of paragraph (2), in order to (A) provide for the sustained participation of such communities, and B) to the extent practicable, minimize adverse economic impacts on such communities."  16 U.S.C. § 1851(a)(8);
>
> National standard nine: "Conservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch." 16 U.S.C. § 1851(a)(9).

The Department of Commerce has promulgated regulations addressing each of the national standards. *See* 50 C.F.R. 600, Subpart D (National Standards).

Once a fishery is declared overfished, the Council has one year to produce a plan that will "end overfishing in the fishery and rebuild affected stocks of fish."  16 U.S.C. 1854(e)(3).  If the Council fails to submit an adequate plan, then the Service has an additional nine months to promulgate a legally sufficient plan. 16 U.S.C. 1854(e)(5).

The deadline for returning an overfished[2] species to full productivity is strict. 16 U.S.C. § 1854(e)(4)*; Natural Resources Defense Council v. Evans*, 421 F.3d 872, 875-76 (9th Cir. 2005).  If it is possible to rebuild an overfished species within ten years, the Service must do

---

[2]Under the Act, a species is considered overfished if it is fished at a rate that jeopardizes its ability to produce the maximum sustainable yield of the fishery ("MSY"). 16 U.S.C. § 1802(34).

so.  *See* 16 U.S.C. § 1854(e)(4).  If a species cannot be rebuilt within ten years, even in the absence of any fishing related mortality, then the rebuilding period must still be as short as possible, but may not to exceed "the rebuilding period calculated in the absence of fishing mortality, plus one mean generation time or equivalent period based on the species' life history characteristics."[3] 50 C.F.R. 600.310(e)(4)(ii)(B); *Natural Resources Defense Council v. Evans*, 421 F.3d 872, 875-76 (9th Cir. 2005).  In the case of the Gulf of Mexico Red Snapper ("red snapper") this period is thirty-one point six years.  Amendment 22 at 1.

*B.  Regulatory action to preserve the Gulf of Mexico Red Snapper.*

Because the red snapper has been actively fished for at least a century, it is difficult to gauge its optimum stock size.  No one contests, however, that the red snapper is severely overfished.  Amendment 22 reflects current population at about seven percent of historic abundance. [4] Amendment 22 at 22. Other studies indicate that red snapper populations are closer to three percent of historic abundance. *See* SEDAR 7 Report issued April 2005 (AR Vol. 2 at 619, 646).

The three main sources of red snapper mortality are the commercial red snapper fishery, the recreational red snapper fishery, and the Gulf of Mexico shrimp fishery.  Of these, the shrimp fishery is believed to be the most lethal, accounting for approximately 90% of red snapper mortality.  Amendment 22 at 36 (citing Schirripa and Legault, 1999).  New information, however, indicates that these proportions might be incorrect and that more red snapper than previously believed die in the commercial and recreational fisheries.  AR Vol. 19 at 9123-34 (Feb. 2004 MacAllister study).

---

[3] "For example, suppose a stock could be rebuilt within 12 years in the absence of any fishing mortality, and has a mean generation time of 8 years. The rebuilding period, in this case, could be as long as 20 years." *Id.*

[4] The Service relied on this 1999 stock assessment in promulgating Amendment 22.  It was, additionally, certified by the Southeast Fisheries Science Center as representing the best available scientific information. Def.'s Mot. Summ. J. at 19.

The Service approved the Gulf of Mexico Reef Fish Fishery Management Plan ("FMP") to address the overfishing of red snapper and other species. Amendment 22 at 16; *see also* 50 C.F.R. 622.1 *et seq*.[5]  Since its implementation, the FMP has been amended twenty-six times.[6]

The Service has consistently extended the rebuilding date for red snapper stocks. In 1990, it set a target date of 2000. In 1991, it extended the target date to 2007.  In 1993, the date was extended to 2009.  In 1996, the date was extend to 2019. And in 2005, the date was extended to 2032. Amendment 22 at 16-19.

While the Service has been extending the length of time needed to rebuild red snapper stocks it has also been raising the total allowable catch (TAC) of red snapper.  TAC was set at four million pounds in 1991. *Id.* at 17.  It was raised to six million pounds in 1993. *Id.* at 18.  And to nine million one hundred and twenty thousand pounds in 1996.  *Id.* at 19. Amendment 22 retains the current TAC.

In 2001, to bring the FMP into compliance with the Sustainable Fisheries Act, Pub. L. No. 104-297 (1996), the Gulf Council submitted an amendment, including a red snapper rebuilding plan ("plan"). *Id.* at 26.  The plan proposed to rebuild red snapper stock by 2032, the longest period permissible under the law.  *Id.* The amendment was rejected by the Service in 2002, and returned to the Gulf Council with instructions to "further explore alternative rebuilding plans based on more realistic expectations concerning bycatch in the shrimp fishery." *Id.* Amendment 22 is the Gulf Council's response.  *Id.*

After notice and comment, Amendment 22 was adopted by the Service on June 2, 2005. 70 Fed. Reg. 105, 32266.  Its most controversial feature is its conclusion that no further

---

[5]The red snapper was not officially declared overfished until 1997.

[6]Amendment 27 is currently awaiting approval.  *See* Proposed Temporary Rule, 71 Fed. Reg. 75220 (December 14, 2006).

regulatory action is needed to end overfishing and rebuild red snapper stocks by 2032. *Id.* at 47. The Gulf Council bases this conclusion on three assumptions: 1) that the commercial shrimp fishery accounts for ninety percent of red snapper mortality; 2) that bycatch reduction devices ("BRDs") are forty percent effective in reducing red snapper mortality in the shrimp fishery; and 3) that shrimping efforts in the Gulf of Mexico will be reduced by fifty percent during each of the years of the rebuilding plan. *Id.* at 5, 49; *see also* Final Rule at 32267.

On March 29, 2005, CCA filed a petition for emergency rule making with the Service. The petition asks the Service to enact measures to address the failure of BRDs to meet regulatory bycatch reduction standards in the shrimp fishery. The Service denied CCA's petition on August 31, 2005, finding that emergency rule making was not warranted and that additional management measures to end overfishing would be better addressed through a Council regulatory amendment. 70 Fed Reg. 172, 53142 (August 31, 2005).

II. Law

To survive judicial review, fishery management plans must be consistent with achieving the conservation goals of the Fishery Act. This is implicit in the Fishery Act's embrace of the APA's standard of review, whereby a final agency action may only be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 16 U.S.C. 1855(f) (Fishery Act); 5 U.S.C. 706(2)(A) (APA). Under this standard, the reviewing court determines agency compliance based solely on the record before the Agency at the time the decision was made. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 419 (1971). The agency must then articulate a "rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 88 (1983). On scientific or technical questions courts usually defer to the agency's superior understanding. This does not, however, relieve the Agency of its obligation to "cogently explain why its [decisions]" satisfy statutory requirements. *Natural Res. Def. Council*, 209 F.3d at 755-56. "A regulation cannot stand if it is

based on a flawed, inaccurate or misapplied study." *Texas Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 935 (5th Cir. 1998).

Stock rebuilding plans must have a fair likelihood of succeeding.  *See National Resources Defense Council v. Daley*, 209 F.3d 747 (D.C. Cir. 2000) (quoting *Fisherman's Dock Coop., v. Brown*, 75 F.3d 164, 169-170 (4th Cir. 1996).  In *National District Resources Defense Council*, a case similar to this one, Plaintiffs sued the Secretary of Commerce, functionally the Service, for violating the Fishery Act, the APA, and NEPA. *Id.* at 751-52.  Plaintiffs argued that the Service had violated the Fishery Act by approving a fishing quota that "did not provide sufficient assurance that it would meet the conservation goals of the Fishery Act and attendant regulations." *Id.* at 749.  The District Court granted the Service's motion for summary judgment, and the Court of Appeals reversed, holding that regulations promulgated by the Service must have at least a 50% likelihood of success. *Id.* at 754.

III.   Application of Law to the Facts.

Plaintiffs argue that the Service violated the APA and the Fishery Act when it approved Amendment 22.  They also argue that the Service violated NEPA by not considering sufficient alternatives to the plan adopted.  Finally, CCA claims that the Service violated the APA and the Fishery Act when it denied its petition for emergency rule making.  After reviewing Amendment 22, the court agrees that the  Fishery Act and the APA were violated when the Service adopted the plan.  The court does not, however, believe that NEPA was violated or that the Service abused its discretion when it denied CCA's petition for emergency rule making.

*A. The Stock Rebuilding Plan*

The stock rebuilding plan contained in Amendment 22 is inconsistent with the scientific data cited by the Gulf Council and has a less than fifty percent chance of rebuilding red snapper stocks by 2032.  This violates the Service's duty to adopt a plan that will rebuild overfished

stocks within the time period established pursuant to Title 16 United States Code Section 1854(e)(4), in this case, thirty-one point six years.

Two pieces of evidence counsel against the Service's adoption of a plan dependent on a fifty percent reduction in shrimping effort. First, the economic studies before the Gulf Council reflect only an estimated thirty-nine percent reduction in shrimping effort.[7] Amendment 22 at 42. Second, these studies project the reduction to occur progressively and culminate in 2012.[8] *Id.* By contrast, the Gulf Council's rebuilding plan, which claims to be based on these studies, depends on a fifty percent reduction in shrimping effort beginning in 1999 and lasting until 2032. *See* Graph, Amendment 22 at 49.

Amendment 22 reflects that the Gulf Council chose to base its projections on a thirty to fifty percent reduction in shrimping effort, which in the Council's words, "provides a range around the reduction in effort given in the above analyses." Amendment 22 at 46. Based on this assertion, the Gulf Council concludes that the reduction will in fact be fifty percent and, moreover, will occurred immediately beginning in 1999. Neither of these conclusions are warranted.

The Service justifies approving the plan in this form by saying the economic analyses were considered conservative. Resp. at 23, n.10 (citing Amendment 22 at 4321). This argument might have been convincing had the Gulf Council merely predicted that a fifty percent decline in shrimping efforts would occur by 2012, but the Gulf Council's plan depends on the fact that a fifty percent decline in shrimping had begun in 1999, a conclusion contradicted by evidence before the Gulf Council and the Service. This is not the kind of reasoned decision making the APA and Fishery Act require. Rather, to meet their statutory and regulatory mandate, Defendants must have a "fairly high level of confidence" the regulatory provisions they recommend will rebuild red

---

[7]These analyses predict a thirty-nine percent decrease in the number of full-time equivalent vessels ("FTEVs") and a thirty four percent decrease in nominal fishing effort in the shrimp fishery to occur by 2012. Amendment 22, at 42; see also Graphs (Amendment 22 at 44, 445).

[8]The Tables showing this conclusion, which are included in amendment 22, reflect that shrimping efforts decline until 2012, when they reach an equilibrium. *Id.*

snapper stocks within the statutorily required period. *Natural Res. Defendant. Council v. Evans*, 209 F.3d at 754.

The Service bears the burden of articulating a "rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 88 (1983). In this case, if the Service adopted a plan that rebuilt red snapper stocks in less than the maximum amount of time permitted under law, it could have argued that the resulting cushion made success at least fifty percent likely, but the Service and the Gulf Council did not choose this path. By adopting a plan that projected rebuilt red snapper stocks in close to the longest period permitted under law, the Gulf Council placed a premium on the accuracy of its predictions.  The Gulf Council's own graphs reflect that even if the economic analyses are spot on, red snapper stocks will not be rebuilt within the required period.  *See* Amendment 22 at 49.  Accordingly, the court will remand Amendment 22 to the Service for promulgation of a rule within the next nine months that has, at least, a fifty percent chance of succeeding.

*B. Minimizing Bycatch.*

Amendment 22 also violates Title 16 United States Code Section 1853(a)(11) by not, to the extent practicable, minimizing bycatch.  The Fishery Act provides that fishery management plans must include "conservation and management measures that, to the extent practicable and in the following priority – (A) minimize bycatch; and (B) minimize the mortality of bycatch which cannot be avoided." 16 U.S.C. § 1853(a)(11).   In this case, Defendants avoided discussing measures to reduce red snapper bycatch in the shrimp fishery by saying they will address the issue in the Shrimp Fishery Management Plan.  This is contrary to the plain meaning of the statute. Accordingly, on remand, the Service will consider and adopt, if practicable, measures to minimize bycatch in the shrimp fishery.

*C. NEPA and Emergency Rule Making.*

   The court finds Plaintiffs' arguments that the Service violated NEPA unpersuasive. NEPA requires consideration of "alternatives to the proposed action" in an environmental impact statement ("EIS").  42 U.S.C. § 4332(C).

> NEPA requires a federal agency in assessing the environmental effects of a project to discuss alternatives to the proposed action. The purpose of the alternatives requirement is to assure that the government agency as a decision-making body has considered methods of achieving the desired goal other than the proposed action. *Sierra Club v. Morton*, 510 F.2d 813, 815 (5th Cir. 1975). Consideration of other realistic possibilities for action forces an agency to consider the environmental effects of a project and evaluate those effects against the effects of alternatives.

*Piedmont Heights Civic Club, Inc. v. Moreland*, 637 F.2d 430, 435-436 (5th Cir. 1981).  In this case, Plaintiffs use their NEPA claims to re-urge their substantive attack on Amendment 22.  As reflected by the Court of Appeals's statement in *Piedmont Heights*, this is not NEPA's purpose.

   Finally, the CCA claims that the Service violated the Fishery Act and the APA when it denied its emergency petition.  The court disagrees and finds that the Secretary was following established guidelines.  The CCA's argument that the Secretary elevated form over substance underlines the tenuous legal foundation of Plaintiff's claim. Bycatch of red snapper in the shrimp fishery is a long recognized problem that the Service should have addressed through its management plan.  It is not, however, a subject appropriate for emergency action.  *See* Policy Guideline for the Use of Emergency Rules, 62 Fed. Reg. 162, 44421 (August 21, 1997).

IV. Conclusion

   For the aforementioned reasons, the court orders that both Plaintiffs' and Defendants' motions for Summary Judgment (Docs. 75, 76, & 78) are GRANTED-in-part and DENIED-in-part. Specifically, Plaintiffs' motions for summary judgment on their claim that the Service violated the APA and the Fishery Act when it promulgated Amendment 22 are GRANTED. Defendants' motion for summary judgement on (1) Plaintiffs' claim that the Service violated NEPA and (2) CCA's claim

that the Secretary violated the APA and the Fishery when he denied CCA's petition for emergency rule making is also GRANTED.   Defendants have requested that the court stay vacatur of the final rule because Amendment 22 is part of "a complex plan that involves many interconnected programs and measures."   The court agrees, and therefore ORDERS that the status quo be maintained during the pendency of the remand. The court further ORDERS that the Secretary of Commerce, consistent with his obligations under the Fishery Act, approve a red snapper rebuilding plan, considering measures to reduce bycatch in the shrimp fishery, within the next nine months.

SIGNED at Houston, Texas, this <u>12th</u> day of March, 2007.

_____
  MELINDA HARMON
  UNITED STATES DISTRICT JUDGE